HELEN W. SMITH AND FRED M. SMITH, HER HUSBAND, PLAINTIFFS, v. GEORGE F. CORRIGAN, DEFENDANT.

Submitted June 5, 1924—Decided November 24, 1924.

1. In an action for damages against a physician for malpractice, evidence of the wealth of the physician is inadmissible, even though punitive damages be demanded in the complaint, unless there is evidence of malice or wrongful motive toward the plaintiff on the part of the defendant.
2. It was error to charge a jury that a physician, responding to a call, impliedly engages to employ the degree of skill and knowledge ordinarily exercised in his profession by physicians of good standing practicing in the locality and similar localities.
3. The skill and care a physician is required to give a patient is that ordinarily possessed and exercised by others in the profession.

---

On defendant's rule to show cause.

Before GUMMERE, CHIEF JUSTICE, and Justices PARKER and KATZENBACH.

For the plaintiff, *Heine, Bradner & Laird* (*M. Casewell Heine,* of counsel).

For the defendant, *Wall, Haight, Carey & Hartpence* (*Albert C. Wall,* of counsel).

The opinion of the court was delivered by

KATZENBACH, J.   This case is before us on a defendant's rule to show cause.   The plaintiffs, Helen W. Smith and Fred M. Smith, her husband, instituted this action against Dr. George F. Corrigan, a physician, alleging malpractice in the treatment of Mrs. Smith.   The jury returned a verdict of $500 in favor of Mrs. Smith and $2,000 in favor of Mr. Smith.

The testimony shows that on January 8th, 1921, Mrs. Smith bruised the calf of her leg between the tire of an automobile and the street pavement.   A lump about as large as a goose egg appeared on the inside of the shin bone at the point of injury.   This lump became badly discolored.   Mrs. Smith was treated at a hospital and at home by a Dr. Huberman, until February 2d, 1921.   On that day Dr. Huberman examined her leg.   The appearance of the lump had changed. It was smaller and had turned to a light yellow color.   Dr. Huberman advised Mrs. Smith to stay in the house.   Mrs. Smith disliked this advice.   She thought another physician would give her advice more to her liking, so she called in the defendant.   She informed him of the accident.   He examined her leg, pronounced the injury a hematona, that is a blood tumor, and advised that it be opened.   Mrs. Smith says that Dr. Corrigan said the opening would be nothing more than a "pin prick incision."   Dr. Corrigan had no instruments with him.   He asked for a safety razor blade.   The blade was furnished, the incision made, and the wound dressed.   Mrs. Smith thought it more than a pin prick incision but paid Dr. Corrigan $5 for the operation.   He promised to return, but did not do so.   Dr. Huberman was then summoned   He was somewhat perturbed over what had happened but consented, upon the dismissal of Dr. Corrigan, to continue treating Mrs. Smith.   The wound became infected. Mrs. Smith was taken to the hospital.   Another operation was performed.   This consisted of opening the leg and draining it.   The openings were slow in healing, and when healed left Mrs. Smith with a scarred and shriveled leg.·  This condition of her limb caused her much mortifica-

tion. She was unable to conform to the prevailing fashion of bathing without stockings. She was obliged, owing to her unsightly leg, to wear stockings. On one occasion, in California, while bathing in stockings, she was asked to leave the pool because other bathers were suspicious that she had an infected leg, and, apparently, had reported their fears to the management, who requested her to leave the pool. It was humiliating to be both unfashionable and suspected.

The defense to the action was that the infection had already set in when the defendant was called by Mrs. Smith, and that the defendant took every precaution to insure asepsis by washing his hands, cleaning his nails, boiling the razor blade, and using an antiseptic solution. The plaintiff and a friend, who was with her during the opening of the leg, denied Dr. Corrigan used these precautions.

The case presents the usual features and contradictory testimony of a malpractice case. It was, we think, properly submitted to the jury. There were, however, certain rulings of the trial court upon evidence and certain portions of the court's charge to the jury to which exceptions were duly taken which require consideration. During the progress of the trial the defendant was asked what he considered his fair net worth in money was. This question and the questions leading up to it were objected to. The objections were overruled, exceptions taken, and the defendant was compelled to answer, and testified that he was worth over $100,000. The complaint demanded punitive damages. The trial court proceeded upon the theory that if punitive damages were demanded in the complaint, that evidence of the pecuniary worth of the defendant was proper. The trial court, in its ruling, referred to the case of *Weiss* v. *Weiss, 95 N. J. L.* 125. The principle laid down in the Weiss case is not applicable to the present case. That case was an action for slander. In an action for slander the words hurt the individual slandered more if spoken by a man of wealth in the community than if uttered by the village drunkard. For that reason the evidence of pecuniary worth in a slander suit is admissible. Moreover, one who speaks defamatory words

of another wrongfully, intends to injure the person defamed. There is present a wrongful motive. Malice exists. Where malice or a wrongful motive exists punitive damages may be recovered. Proof of facts showing the existence of malice lays a foundation for punitive damages. Outside of these exceptional cases where wealth is necessarily involved in determining the damages sustained, evidence of wealth is inadmissible unless there be proof of malice. It is a cardinal principle of our jurisprudence that the rich and poor stand alike in courts of justice. Neither the wealth of the one or the poverty of the other is permitted to affect the administration of the law. *Hutchins* v. *Hutchins, 98 N. Y.* 64.

The question at issue in the case *sub judice* was whether the defendant had exercised, in the treatment of Mrs. Smith, the skill and care ordinarily possessed and exercised by others in his calling, not the wealth or poverty of the defendant. We can see, in the testimony offered, no evidence which affords a basis for punitive damages. Mrs. Smith and the defendant had, at the time he was summoned to attend her, known each other for many years. He had been the family physician of her father and her foster mother. He had removed the tonsils of her son. She had confidence in him. These were the reasons which actuated Mrs. Smith in consulting the defendant. There is nothing in this testimony which suggests malice on the part of the defendant. It seems somewhat unusual to use a safety razor blade to open a blood tumor, but from this circumstance alone a wrongful motive on the part of the defendant towards Mrs. Smith cannot be inferred. In the absence of a foundation upon which to rest a claim for punitive damages it was improper to force the defendant to testify to his wealth. The testimony was irrelevant. While the verdicts were not large, yet it cannot be said that the evidence might not have tended to cause in the minds of the jury a sympathy for Mrs. Smith and a justification for the separation from the defendant of some of his abundant means to compensate Mrs. Smith for her warped and withered limb, unwarranted by the evidence.

The same error again appears in the charge. The court

charged that "unless you find in this case there was a wrongful personal intent on the part of this doctor to injure this woman, and that this culminated in a wrongful act, done intentionally, without just cause or excuse; if you do not find that, you can find no punitive damages." To this portion of the charge an exception was taken. The charge assumes that there was evidence in the case from which a wrongful personal intent on the part of the defendant to injure Mrs. Smith could be found by the jury. We think there was no evidence from which such an intent could be found. It was therefore error to have charged the jury in the manner stated.

Counsel for the defendant also took an exception to that portion of the charge of the court which dealt with the degree of care and skill to be employed by the defendant, and now argues that the court was in error in charging as it did. The exact language used was: "If Dr. Corrigan assumed charge of the treatment of the plaintiff, and came to her home at her request, there was an implied contract on his part that he would employ that degree of skill and knowledge as was then ordinarily exercised in his profession by physicians of good standing practicing in this and similar localities." This was again repeated in charging a request to charge submitted by the plaintiffs' counsel. The request was in these words: "The defendant, in responding to the plaintiff's call for his services, and in proceeding to treat her, is presumed to have agreed to follow the practice established and in vogue among physicians and surgeons of this locality. If you find that the defendant failed to follow this established practice, either with respect to the methods used by him in performing the operation complained of, or in his treatment of the patient following the operation, then the defendant was negligent; and if you find that the condition of the wound which later necessitated the second operation was the probable result of the failure of the defendant to follow the established practice above referred to, the plaintiffs are entitled to your verdict."

The skill and care a physician is required to give a patient has, in this state, been laid down in several cases. The late Mr. Justice Knapp, in the Court of Errors and Appeals, in the case

of *Ely* v. *Wilbur,* 49 *N. J. L.* 685, stated the law on this subject in the following language: "The skill and care required in doing the work in order to deserve compensation is that ordinarily possessed and exercised by others in like callings. * * * The physician, like the attorney, undertakes in the practice of his profession that he is possessed of that degree of knowledge and skill therein which usually pertains to the other members of his profession. And the physician, in attending his patients, engages that he will use due care to discover the nature of the disease which gives occasion for his services, and in applying the usual remedies. But beyond this measure of skill and diligence the law makes no exaction. If he is to be held for results, or as a guarantor of success, it can be only in virtue of his express engagement. Ordronaux, in his *'Jurisprudence of Medicine,'* states the rule in question clearly. The physician, he says, is not a guarantor, without express contract, of the good effects of his treatment, and he only undertakes to do what can ordinarily be done under similar circumstances. If the good effect of his treatment and the consequent value of his services be disputed, he must be prepared to show that his labor was performed with the ordinary skill and in the ordinary way of his profession. This is all the essential evidence upon which to found his case." *Ord. Med. Jur.* 42.

The late Chief Justice Depue, in the case of *Policastro* v. *Lahnecker,* 12 *N. J. L. J.* 269, said: "The proper rule, I think, is that the law requires of the physician that degree of knowledge and skill which is usual in the grade of the profession which he occupies, and in which he was employed in the particular case—in this case a general practitioner."

The language of the court did not correctly state the standard of skill and care required by these decisions.

For the reasons above given the rule to show cause will be made absolute.